(No. 21575.—

THE ILLINOIS STATE TRUST COMPANY, Admr. *et al.* Plaintiffs in Error, *vs.* CHARLES E. JONES *et al.* Defendants in Error.

*Opinion filed February 23, 1933.*

SHAW & HUFFMAN, for plaintiffs in error.

PARKER, COX & EAGLETON, for defendants in error.

Mr. JUSTICE ORR delivered the opinion of the court:

The Illinois State Trust Company, administrator of the estate of John Paull Jones, deceased, and Nelle Farthing Jones, widow of the decedent, plaintiffs in error, filed a bill in chancery in the circuit court of Crawford county against Charles E. Jones, Ramon Jones and others, defendants in error. Upon the hearing the court found the issues for the defendants and dismissed the bill for want of equity. The cause is here on writ of error prosecuted by complainants.

The bill sought to impress certain property with a trust and asked for partition and an accounting. It alleged that John Paull Jones was the owner of an equitable interest in lot 2 in Columbia place, in East St. Louis, and that Charles E. Jones held the legal title in trust for John Paull. Other property sought to be impressed with a trust consists of the undivided one-third of all the property devised and bequeathed by the will of George W. Jones, deceased, to the defendants Charles E. Jones and Ramon Jones.

George W. Jones, deceased, was the father of John Paull, Charles E. and Ramon Jones. The father died on September 26, 1929. By his will he bequeathed to John Paull the sum of $100 and gave all the residue of his property to Charles and Ramon. The will was executed on April 27, 1928. On May 10, 1928, George W. made a memorandum in triplicate and delivered a copy to each of his three sons. The first paragraph is as follows: "For the guidance of my sons in whatever division they may hereafter make of my real estate, I submit the following estimate of values, for that purpose only, and not as a sale price. Nor have I valued the farm, for I suggest that it be held to await whether there be found deeper oil production, in common, until they are convinced otherwise." Following this is a list of real estate, with values set opposite the different tracts. Specific items of household furnishings which he desired each son to have are then mentioned. The memorandum did not purport to be a will or a codicil to his will and was not witnessed.

The bill alleged that John Paull Jones (hereinafter called Paull,) died intestate on March 7, 1931, leaving Nelle Farthing Jones, his widow, and Charles E. and Ramon Jones, his brothers, his only heirs-at-law, and that the bequest and devise made to Charles and Ramon were fraudulently procured by their verbal agreement with the testator and Paull to hold the legal title to all of the property of George W. as trustee for themselves and Paull in equal shares and to make an equal division thereof among them; that by force of the agreement Paull was entitled to receive an undivided one-third of all the property of which his father died seized; that some distributions had been made in accordance therewith, and later the agreement was repudiated by Charles and Ramon. It sets out the interest to which it is alleged Nelle Farthing Jones, as widow of Paull, is entitled in all the property. The bill prayed that defendants Charles and Ramon be decreed to execute and

deliver proper deeds of conveyance to Nelle Farthing Jones for her interest in the real estate, and for the assignment of dower and partition of the residue of the property. An amendment to the bill alleged that Paull conveyed lot 2 in Columbia place to Charles without any consideration, for the purpose of hindering and delaying creditors and defeating and evading legal demands for the payment of money. A demurrer to the amendment was overruled. Defendants elected to stand by the demurrer and filed an answer to the remainder of the bill denying all charges of fraud, and especially denying that they promised the testator to hold any of the property in trust for Paull. The answer alleged that no contest of the will was instituted and that the probate thereof is binding and conclusive upon all persons; that the trust was not in writing; that it purported to cover an interest in real estate and to be a contract extending for a period of more than one year, and was therefore void under sections 1, 2 and 9 of the Statute of Frauds.

It is urged that the decree of the trial court is against the manifest weight of the evidence. Complainants contend that on April 26, 1928, the day of the funeral of their step-mother, their father called his three sons into a room where he was lying on a couch and stated to them that he was going to make his will; that due to certain domestic and financial troubles of his son Paull he was going to leave him $100 and the balance of his estate to Charles and Ramon; that Charles would be executor; that he and Ramon should take and hold the estate with the understanding that it would be divided equally among all three sons, and that the three sons agreed among themselves and with their father to the arrangement. No witness testified to the alleged conversation between George W. and his sons. Charles and Ramon offered to testify to the details of that conversation, but objections to their competency were sustained. Numerous letters and telegrams passed among the three brothers and were introduced in

evidence. In none of them was there any direct admission by Charles or Ramon that a trust existed or that the property of their father was to be distributed in any other manner than as provided by his will.

In support of the allegation that some of the estate had been equally distributed among the three sons, it was shown that shortly after the will was probated a certificate of deposit for $10,500 was converted into cash. Out of this fund Charles and Ramon each took $5000 and left $500 in the executor's account. Paull was having domestic trouble. The testimony shows that he explained his needs and told his brothers he could get a divorce for $3000. It is claimed by complainants that Ramon and Charles each gave Paull a check for $1500 and cash enough to account for one-third of the $10,000, plus $100 which Paull had received as his legacy. In February, 1930, Paull was in Reno, Nevada, seeking a divorce from his wife. He was importuning his brothers to obtain a loan of $1500 for him. Several telegrams passed between the three brothers in relation to the matter. A loan was finally arranged at a bank and Ramon signed the note with Paull. Charles at first refused to sign it but later did so. After the note became due, a time certificate belonging to the estate for $5100 was cashed, from which Charles paid the principal and interest due on the note, amounting to $1518.08, and sent Paull the note and a check for $181.92, making a total of $1700, or one-third of the amount of the time deposit. Charles wrote Paull that the check would be with his account as executor and would keep the matter straight when the time came. On another occasion $2400 of the money of the estate was divided equally between Charles and Ramon. Some time later Ramon gave Paull $400. He testified that he suggested that Charles do the same, but Charles did not definitely agree to do it, and, in fact, never did it. However, he wrote Paull that if he could get something out of his lumber in Florida he would send him $400.

Later Charles wrote Paull that he was unable to send it. It appears that at Paull's request some securities belonging to the estate were made available to him for deposit with a bank as collateral for a loan.

On November 2, 1929, Charles wrote Paull that he expected to trade one of the places in Robinson for a house in St. Petersburg, Florida, and that in case he did so the value of the place in Robinson could be deducted from his share of the estate. At another time he wrote Paull that Ramon was improvident in money matters and proposed that the funds of the estate be left invested as they were at that time and the income divided or re-invested so that Ramon would have no large amount coming into his hands and funds would be available when needed to educate his children. He asked Paull's advice in the matter and if he would "back him up" in it. Later he wrote Paull that $5000 of the estate money had been put into a time certificate, $3000 in bonds and the remainder was being used to pay claims, and that the car which Ramon took at the appraised value would be deducted from his share of the property. It is contended the letters and telegrams from Charles to Paull contain expressions which recognize the alleged trust agreement. But whatever may have prompted defendants to make contributions to Paull, it is clear that within a few months after the will was admitted to probate they denied the existence of a trust agreement and any obligation to make an equal distribution of their father's estate.

The will was probated October 2, 1929. On March 18, 1930, Paull, who was seeking further advancements, wrote Charles that notwithstanding the will it was his father's desire and the agreement of all of them that the estate should be divided equally among them, and that the agreement was made to protect them from pillage and plundering by people whom they all had in mind at that time. He asked Charles to state his intentions about so dividing the

estate. On March 27 Charles wrote Paull denying that any agreement to divide the estate equally had ever been made and that he meant to carry out his father's wishes as expressed by the will. Thereafter numerous communications passed between the brothers. In one of them Paull threatened to take steps to secure what he called his share in the estate. In another letter he stated, in substance, that he never expected to bring any suit in relation to the matter but was leaving in his file the details of his claim for the benefit of those to whom his rights would descend. On November 10, 1930, Charles again wrote Paull that he had no intention of making an even distribution of the estate.

George W. Jones was a lawyer, and it is evident from all the proof in the case that he did not intend the memorandum, executed in triplicate, to have any more than a precatory effect upon the beneficiaries of his will. It can not be considered as a testamentary direction or disposition of property, and it is to be noted that it does not even suggest an equal division of the property.

Paull died on March 8, 1931, and was buried in East St. Louis. After his funeral Ramon was invited to the law offices of the brothers of Paull's widow. He there met the brothers, another lawyer and some other parties. He was questioned about the conversation between his father and the sons after the burial of the step-mother. The witnesses gave versions of the interview which did not greatly differ, and all agreed that Ramon denied that the father demanded and the sons promised to give Paull a specific portion of the father's estate. Ramon declared there was no agreement that the will should have any effect other than its plain provisions indicated. He conceded that there was a conversation between George W. and his three sons, in which the father referred to the serious domestic difficulties of Paull and indicated a desire for Ramon and Charles "to take care of Paull," but what the amount should be was left to their judgment and discretion. There is no tes-

timony in the record which shows that there was an agreement that Paull should share equally with his two brothers. He was informed, within a few months after the will was probated, that there would be no equal division. He took no step to contest the will within the statutory period or to institute any legal proceeding to obtain a portion of the estate. County judge W. A. McCarty, who granted an order for a partial distribution at the time Paull received checks from his brothers amounting to $3000, testified that Paull was present in court when the application came up for consideration and was advised by the judge that the estate was a large one, and the order for a partial distribution between Ramon and Charles would not be granted unless Paull was satisfied with his own legacy and would receipt for it in open court. Paull expressed his satisfaction with the terms of the will, signed a receipt for his legacy and said the will should stand as far as he was concerned. He further said that his brothers were going to let him have $3000 to get rid of his wife. He called Judge McCarty by telephone from East St. Louis six months later and talked about bonds he desired to obtain for collateral security but expressed no dissatisfaction with the terms of the will or made any claim to a right to an equal distribution with his brothers. About a month before Paull died he went to Robinson and called upon Judge McCarty, to whom he said that his brothers were running through with their portions of the estate and asserted he was entitled to share in it. He asked the judge to see if they would not agree to assign to Ramon's children one-third of the estate to which he said he was entitled. This was the first time he ever made any such claim to the county judge, and his position was entirely different from that taken in his earlier conversations with the witness.

Where an alleged trust does not appear on the face of a deed, will or other instrument and it is sought to establish it by parol evidence, such evidence must be unequivocal

and unmistakable. (*Keuper* v. *Mette*, 239 Ill. 586; *Sharp* v. *Sharp*, 328 id. 564.) In order to establish a trust the evidence must be clear and satisfactory not only as to the existence of the trust but also as to its terms and conditions. (*Lurie* v. *Sabath*, 208 Ill. 401.) It is essential to the creation of a trust that the declaration must make reasonably certain its terms. These terms include the subject matter, the beneficiaries, the nature and quantity of the interests which they are to have and the manner in which the trust is to be performed. If any of these elements are not described with certainty no trust is created. (*Marble* v. *Marble*, 304 Ill. 229; *Snyder* v. *Snyder*, 280 id. 467.) The record in this case is not sufficient to sustain the contentions of the complainants under these established rules. George W. Jones was well acquainted with the difficulties surrounding his son Paull. He declared in his will that he had already made advancements to Paull, and assigned that fact as a reason for making larger provisions for his other sons. Had the father wanted to create a spendthrift trust in Paull's favor he knew how to do it, but he made no effort to do so.

The demurrer was correctly sustained to that part of the bill of complaint seeking to set up a trust in lot 2 in Columbia place for the alleged reason that Paull was the real owner and had transferred the lot to Charles without consideration, for the purpose of hindering and delaying his creditors and defeating legal demands. Where a conveyance is made for the purpose of hindering, delaying or defrauding creditors, equity will not interpose to restore to the grantor or his heirs the title to the property so conveyed. *Rosenbaum* v. *Huebner*, 277 Ill. 360.

The complainants having failed to establish a trust as required by law, the chancellor properly dismissed the bill for want of equity, and the decree is therefore affirmed.

*Decree affirmed.*