Frank G. Reynolds et al., Appellees, v. The First National Bank of Chicago et al., Defendants.
Abel Davis et al., Cross Complainants, v. Frank G. Reynolds et al., Cross Defendants.
Appeal of David Labowitch et al., Appellants.

Gen. No. 37,715.

582

Opin-
ion filed April 10, 1935. Rehearing denied April 22, 1935.

SHULMAN, SHULMAN & ABRAMS and HAROLD J. FIN-
DER, all of Chicago, for appellants; MEYER ABRAMS, of
counsel.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for appellees and cross appellants Abel Davis, Murray Wolbach and Howard A. Loeb.

POPPENHUSEN, JOHNSTON, THOMPSON & COLE, of Chicago, for appellee and cross appellant Central Republic Trust Co.; HENRY L. KOHN, of Chicago, of counsel.

AMBERG, OTT, DAHLIN & LIVINGSTON and NAT. M. KAHN, all of Chicago, for appellant First Nat. Bank of Chicago; JOHN N. OTT, of counsel.

WEST & ECKHART, of Chicago, for complainants as appellants and appellees.

MR. JUSTICE WILSON delivered the opinion of the court.

The complainants, Frank G. Reynolds et al., seek to establish an equitable lien on funds deposited with the First National Bank, one of the defendants herein, by David Labowitch, also a defendant in the cause.

Complainant's claim arose out of a lease between complainant and Labowitch to certain premises known as 24–32 North Dearborn street in the City of Chicago. The fund in question appears to be made up of rents collected by the lessee from the subtenants occupying the premises in question and deposited as a special account designated as "24 to 32 N. Dearborn St. Bldg. a/c Special."

Abel Davis and others, constituting a bondholders' committee, also claimed the fund under and by reason of an oral trust.

From the record it appears that after the procurement of the lease in question by Labowitch, he, together with one Morris, improved the property and in order to do so issued certain bonds secured by a trust deed on the leasehold hereinbefore referred to.

Finder, Rickie and Sarah Labowitch claimed an interest in the fund as assignees of David Labowitch. These latter claims are not disputed by the defendant David Labowitch, but are dependent upon his title to the fund.

The county treasurer, Thomas D. Nash, filed his intervening petition in the cause based upon unpaid taxes due against the premises involved herein. By the decree and also through an arrangement with the complainant, Nash was dismissed out of the suit and is not a party to this appeal.

The defendant Morris who joined with David Labowitch in the issuance of the bonds in question, has no interest other than that of the defendant Labowitch and makes no claim.

The First National Bank which was made a party defendant to the proceeding, appears to occupy somewhat the position of a stakeholder, but with an individual interest in the fund. This interest was based upon a promissory note payable by Labowitch for $3,500 and on May 13, 1932, the bank charged this amount against the deposit already referred to. May 3, 1932, complainant served the bank with notice of its interest in the fund and subsequently the bank made payments at the direction of David Labowitch, which are sought to be recovered. It also has an interest inasmuch as it was taxed for part of the costs of the proceedings. The fund on deposit with the bank was carried as a checking account.

The Central Republic Trust Company was the trustee by succession in the deed of trust given to secure the building bonds. It came into the case upon the filing of the second amended cross-bill of the bondholders' committee and joined therein. It had no arrangement with David Labowitch or anyone else as to the fund involved and had taken no steps to secure the rents for the benefit of all the bondholders. Its

interest, if any, is dependent on that of the bondhold-ers' committee.

The master in his report found that the complainant had no cause of action and also found against Davis and others known as the bondholders' committee, and entered his finding in favor of the defendants. Upon objections filed the chancellor sustained the objections and found in favor of the complainant and against the bondholders' committee and the other defendants to the cause.

For the purpose of brevity, the parties will be re-ferred to as the complainant, the bank, Labowitch and the bondholders' committee.

A brief synopsis of the facts in general and those surrounding the claim of each contestant is necessary to a thorough consideration of the cause and for the purpose of establishing the basis upon which each in-dividual claim rests.

William D. Boyce, the owner of the premises known as 24–32 North Dearborn street, Chicago, Illinois, exe-cuted his lease to the premises to David Labowitch for a term beginning February 1, 1923 and ending June 29, 1983, as to part of the premises, and ending April 30, 1990, as to the balance. William Boyce died June 11, 1929, while the lease was still in effect, leaving his estate, including the leasehold, to the State Bank of Chicago, as trustee, and by a series of substitutions the trusteeship was changed until at the time of the bringing of this action the title of trustee was in the complainants, Frank G. Reynolds, Mary J. Boyce and Dickinson Bishop.

The general taxes against the property were due and unpaid at the time of the filing of the bill of com-plaint for a part of the year 1928 and for the years of 1929 and 1930, amounting in all to more than $80,000. The lessee Labowitch defaulted in the payment of the

rent which was due February 1, 1932, and remained in default from that time on.

May 3, 1932, the complainant served notice upon the First National Bank to the effect that the lessee was in default in the payment of rent for the premises and had been for a period of over 90 days past and that by the terms of the lease, the rents and profits from the premises had been assigned and mortgaged to the lessor. The notice also contained the statement that Labowitch, the lessee, had an account with the bank which consisted of all rentals from the premises and that the lessee being in default demand was made for the amount of the deposit known as account ''24-32 North Dearborn St. Bldg. A/C Special.''

The complainant did not take actual possession of the premises nor begin the collection of rents therefrom until after May 3, 1932, the date of the foregoing notice.

December 22, 1924, Benjamin I. Morris and David Labowitch executed their trust deed securing a bond issue of $200,000. The Central Republic Trust Company by succession at the time of the filing of the bill had become successor in trust in the trust deed issued to secure these bonds. This deed provided among other things that in default of payment of any of the instalments of principal or interest, the legal holders of outstanding bonds aggregating two per cent of the total amount were authorized to declare immediately due and payable the principal sum and to cause the trustee to institute foreclosure proceedings and to take possession of the premises described in the trust deed. As we have already stated this trust deed is on the leasehold of the premises known as 24-32 N. Dearborn street.

A default having occurred in the payment of the interest on these bonds, a bondholders' committee was organized consisting of Abel Davis, Joseph E. Otis, Howard A. Loeb, John P. Oleson, B. M. Winston,

Murray Wolbach and M. E. Greenebaum. During the pendency of this suit Winston has died and Otis, Oleson and Greenebaum have resigned as members of the committee.

May 7, 1932, the bondholders' committee notified the defendant Labowitch and the First National Bank that this special account in the name of Labowitch had been opened for the benefit of owners and holders of the bonds secured by the trust deed upon the property. The special account in controversy was opened with the First National Bank December 21, 1931. Prior to the opening of this account Labowitch had carried his account with the Central Republic Bank & Trust Company in which Labowitch had been accustomed to depositing the rents and profits from the premises. Sometime prior to May 1, 1932, Labowitch had executed a promissory note to the defendant, First National Bank, which became due and unpaid and on May 13, the bank charged the special account of Labowitch with the sum of $3,500, the amount of the note, and credited itself with that amount. May 7, 1932, on the check of Labowitch, the First National Bank paid out of the special account to one Joseph Rosenberg, the sum of $3,500 and charged this amount against the credit balance remaining in the special account. May 12, 1932, by assignment, David Labowitch conveyed the sum of $2,500 to Harold J. Finder and notified the bank of this transfer of that amount of his account. May 14, 1932, Labowitch again executed an assignment of $10,000 to this special account in favor of Rickie Labowitch and Sarah Labowitch, relatives of the assignor, and again notified the bank of this additional assignment. At the time of the filing of the bill of complaint there was a credit balance in the amount of $11,976.21.

September 21, 1931, the bondholders' committee was organized and represented approximately 60 per cent of the total bond issue. The bonds represented by this

committee were transferred to it under the terms and provisions of a certain deposit agreement dated December 12, 1929, and was for the benefit and protection of the owners of the bonds so deposited with the committee.

At no time does the record show that the trustee undertook to sequester or take possession of the rents derived from the building. True a foreclosure suit was started but nothing was done by reason of it. By a system of elimination we find, therefore, that the claim of the intervening petitioner Nash, as county treasurer, is no longer involved and that Morris, by assignment, had conveyed all his right, title and interest in the fund to Labowitch. The rights of the assignees in and to their proportionate interest in the fund is dependent upon the right of David Labowitch and prevail or fall in accordance with his success or failure in the litigation.

We also find that the rights of the First National Bank, defendant, as to amounts paid out after the notice of May 3, are dependent upon two things: First, the right of Labowitch in and to the fund, and second, its right as a depository bank to honor checks drawn by Labowitch against this fund as a duty arising in the regular course of its banking business.

Considering the claim of the complainant in the first instance, we are compelled to consider the terms of the lease. Paragraph 12 provides:

". . . the Lessor shall have a first and valid lien . . . upon all sub-rents and other incomes, issues and profits of said land and improvements and upon the entire estate, rights and interest of the Lessee in said land and improvements or otherwise under this lease, as well as upon all insurance policies issued pursuant to the provisions hereof, and upon all money realized upon such policies, and upon all money and other property held by any trustee under the provisions of the

'Fifteenth,' 'Sixteenth' and/or 'Seventeenth' subdivisions of this lease, to secure the payment of all money (including interest) at any time becoming due to the Lessor under the provisions of this lease, and to secure the prompt satisfaction by the Lessee of all his obligations under this lease.''

The fifteenth paragraph of the lease provided that the lessee should within five years expend not less than the sum of $100,000 in permanent general improvements on the building.

Paragraph 12 also provides that the lien reserved may be foreclosed in equity when the money due the lessor from the lessee shall remain unpaid for a space of 10 days and after written notice to the lessee; provides the right of the lessor to institute foreclosure proceedings and then follows a provision by the lessee assigning and transferring the rents due by virtue of any sublease, ''Provided, however, that the Lessor shall not have the right to collect said avails, rents, issues and profits, or to take possession of said premises, unless and until the said Lessee shall be in default for a period of ninety (90) days in the payment of any of the rentals specified in the 'Fifth' subdivision of this lease, or unless and until the Lessee shall be in default for a period of thirty (30) days in the payment of taxes or any part thereof, as specified in the 'Sixth' subdivision of this lease.''

Paragraph 13 also provides that if the lease demised be ended in any manner prescribed in the twelfth or thirteenth subdivision, then all insurance policies and all insurance money held by the lessor, ''together with all estate, right and interest of the Lessee in and under this lease and in the land above described and all improvements thereon, including all rents, issues and profits of said lands and improvements, whether then accrued or to accrue, shall (without any compensation therefor being made to the Lessee) at once

upon the conclusion, in any manner in this 'Thirteenth' or in the 'Twelfth' subdivision provided, of the term hereby demised, pass to and become the property of the Lessor, not as a penalty or forfeiture, or as of the nature of a penalty or forfeiture, but as the liquidated damages of the Lessor due to such default of the Lessee, hereby fixed and agreed upon by the parties hereto, both parties hereto recognizing the impossibility of precisely ascertaining the amount of damages sustained by the Lessor in consequence of such default, and both parties desiring to obviate any question or dispute concerning the amount of such damages.''

Under the terms of this lease the defendant Labowitch raises three questions:

First, it is insisted that the money in the deposit was rents already collected by the lessee and, therefore, ceased to be rents, but instead became cash;

Second, that by the terms of the lease the lessor, having undertaken to declare a default, was not entitled to the rents, issues and profits until the expiration of the 90-day period provided in the lease; and

Third, that the lease itself, in accordance with the terms of paragraph 13, provides for the damages by agreement of the parties and that by taking possession under the default, the lessor was entitled only to the premises together with the improvements, moneys due under insurance policies and the rents subsequently to accrue. The lease provided that the lessor should have a first and valid lien on all subrents and on other income, issues and profits on the land and improvements.

There is a very serious question as to whether or not moneys already paid should still be designated as rents within the meaning of the lease. If the assignment was an outright assignment of all rents, whether collected or otherwise, the lease having been recorded, then such moneys could be traceable into the hands of

others to whom they were paid by the lessee. If the lien provided was intended as security, the title to the rents would be in the lessee until, according to the terms of the lease, the lessor had signified his intention of availing himself of the right to his lien. We have no quarrel with the cases cited by counsel to the effect that the court will declare an equitable lien in proper cases as to funds on property in the hands of others, but courts of equity will not go counter to the express agreements of the parties.

Where there is an agreement in writing the written words are controlling. The lease expressly provides when and how the lien for rentals shall take place and be enforced. Among other rights reserved by the lessor is the right to have a receiver appointed after 10 days' notice, for the purpose of operating the property and collecting the rents.

Paragraph 12 of the lease expressly provides that the right to collect rents on the part of the lessor in case of default in the payment of rent, is limited by a clause therein providing that this right shall not come into existence until the default shall have extended over a period of 90 days. If the assignment of the rentals was an outright assignment, such a clause would be unnecessary and the rights of the lessor attach at once. It was evidently the purpose of the section to provide the lessee with an opportunity to rectify the default in the payment of rent and there is no question in our minds but that the rents collected would be available as well as other funds for the purpose of the payment of the lease rentals. The language would indicate that it was the intention of the parties that the assignment was intended as a security rather than an outright assignment. Cases analogous are those based upon the construction of mortgages wherein the courts have repeatedly held that the assignment of rent is intended merely as security.

*Rohrer v. Deatherage,* 336 Ill. 450; *Levin v. Goldberg,* 255 Ill. App. 62; *Taylor v. Osman,* 239 Ill. App. 569.

In the case of *Levin v. Goldberg, supra,* the court in its opinion says:

"The provision in a trust deed, pledging the rents, issues and profits is for the sole purpose of providing a secondary fund or security to protect the mortgagee against loss in the event that upon foreclosure and sale there is a deficiency. Until the mortgagee takes possession or procures the appointment of a receiver he has no better claim to the rents than a stranger. Until he takes such action the owner may permit any person whether duly authorized in writing or otherwise to collect the rents and retain, from the amounts collected, commissions and disbursements. It is his money and he may do with it as he pleases." *Gubbins v. Equitable Trust Co.,* 30 Ill. App. 17.

If the word "assignment" as used in the lease were strictly construed, the rents in the first instance should have been properly payable to the lessor. Such a construction would be abhorrent to equitable principles and certainly in conflict with the written words contained in the lease. From the facts in evidence it appears that the default occurred February 1st, at the time when the February rent was due from the lessee to the lessor. May 1, 1932, marked the end of the 90-day period provided in the lease under which the lessor was entitled to the collection of the rents. The funds in question on that date were already on deposit with the First National Bank in the name of David Labowitch, as depositor. Even though upon that date the lessor was entitled to the rents, it could only be to such rents as thereafter became due and payable or had already accrued from the subtenants. In our opinion the moneys already collected were the property of Labowitch and could not be affected by the notice served by the lessor. In this connection it is well to

observe that the notice forfeiting the lease was dated September 20, 1932. It should also be noted that under the notice of May 3, directed to the First National Bank by the lessor, no claim is made to any equitable lien against the fund in the possession of the bank, but the right of the lessor is based upon the lease and particularly that section pertaining to the right to collect rents after the expiration of the 90 days as provided in the lease. As we have already pointed out, this right vested after the funds had already been deposited by Labowitch.

The lease contains a further pertinent covenant. This covenant provides that if the terms of the lease be ended, whether according to paragraph 12 or 13, or otherwise, then all right and interest of the lessee in and under the lease, pass to and become the property of the lessor, not as a penalty or forfeiture, but as liquidated damages. This provision appears to have been based upon the proposition that it would be impossible to ascertain in exact terms the amount of the damages sustained by the lessor.

By electing to terminate the lease and take the property, the lessor has availed himself of his rights under this clause to accept in full the property and the improvements in payment of any claim the lessor may have. *West Frankfort Bldg. & Loan Ass'n v. Dorris,* 260 Ill. App. 21; *Parker-Washington Co. v. Chicago,* 267 Ill. 136. In the case of *West Frankfort Bldg. & Loan Ass'n v. Dorris, supra,* the court says:

"What the general rule is in cases where the rents and profits have been pledged for the payment of the mortgage debt, interests and costs, need not be decided in this case, for the complainants in their bill ask for strict foreclosure, and the decree finds, 'the complainant is willing to accept the conveyance of said mortgaged property to it in full payment of the debt, interest and costs due in this case.' This decree was filed

in the circuit court of Franklin county on December 13, 1928. The complainant by electing to have strict foreclosure of its mortgage and by accepting the property in full payment of the mortgage debt, interest and costs, is now estopped from any claim or title to the funds in the hands of the receiver.''

In the case at bar the lessor by declaring a default, in our opinion, has relegated himself, with regard to his rights, under the liquidated damages clause of the lease. In the case of *First Nat. Securities Co. v. Ward,* 275 Ill. App. 521, the court in its opinion said:

''Counsel for defendants, in urging the affirmance of the judgment appealed from, contend that 'no recovery can be had upon any contract for unpaid installments *if the contract has been forfeited by the vendor; and that after such forfeiture the contract in itself is at an end,* and becomes extinct and is rendered void so as to bar any action thereon for any part of the money due thereunder.'

''In 20 Corpus Juris, p. 14, sec. 10, it is said:

'' 'A remedy based on the theory of the affirmance of a contract or other transaction is inconsistent with a remedy arising out of the same facts and based on the theory of its disaffirmance, or rescission, so that the election of either is an abandonment of the other. (Citing cases.) Where a party rescinds a contract the law does not permit him thereafter to make use of it as subsisting for the purpose of claiming damages, or for the purpose of recovery thereon.' (Citing *Stinson v. Sneed* [Tex. Civ. App.], 163 S. W. 989, 991.)''

We are of the opinion that the master in chancery was correct in recommending the dismissal of the bill of complaint and that the chancellor erred in holding otherwise.

The claim of the bondholders' committee appears to be based entirely upon an oral agreement between

Labowitch and the committee. The second amended cross-bill sworn to charges that the arrangement was for the benefit of the committee, but fails to charge that it was for the benefit of all the bondholders. No right is predicated upon the trust deed given upon the leasehold to secure the bondholders. In an examination of the evidence produced in support of this contention of the cross complainants, it is well to first keep in mind the rule applicable in order to prove an oral trust. In this connection the Supreme Court in the case of *Illinois State Trust Co. v. Jones,* 351 Ill. 498, in its opinion said:

"Where an alleged trust does not appear on the face of a deed, will or other instrument and it is sought to establish it by parol evidence, such evidence must be unequivocal and unmistakable. (*Keuper v. Mette,* 239 Ill. 586; *Sharp v. Sharp,* 328 id. 564.) In order to establish a trust the evidence must be clear and satisfactory not only as to the existence of the trust but also as to its terms and conditions. (*Lurie v. Sabath,* 208 Ill. 401.) It is essential to the creation of a trust that the declaration must make reasonably certain its terms. These terms include the subject matter, the beneficiaries, the nature and quantity of the interests which they are to have and the manner in which the trust is to be performed. If any of these elements are not described with certainty no trust is created. (*Marble v. Marble,* 304 Ill. 229; *Snyder v. Snyder,* 280 id. 467.)" To the same effect see *Smith v. Baxter,* 239 Ill. App. 453. The creation of such a trust must be definite in its terms and should specify the fund, the beneficiaries, the nature and the quantity of the interest, and the manner in which the trust is to be performed. A mere agreement to pay generally out of a designated fund does not necessarily operate as an equitable assignment of such a fund. *In re Interborough Consolidated Corp.,* 288 Fed. 334.

A case somewhat similar to the one involved here is *Hamilton v. Downer,* 152 Ill. 651. In this case an action was brought by the executor of the deceased against Mary Donner on a writing in which the said Mary Donner agreed to pay the claim of Jane Donner out of the estate of Samuel Donner or out of the proceeds of sale of such property in said estate and that Jane Donner was to have a voice in the matter as to the disposition of the property held by Mary Donner. It was held that such an agreement did not necessarily create a trust fund even though it was sought to show that Jane Donner held a claim which she had and which could have been filed in the probate court against the estate.

Cross complainants attempted to show that the agreement between them and Labowitch was for the benefit of the bondholders' committee, inasmuch as the money was to be used to pay the interest on the bonds and the operating expenses of the building and that, therefore, the agreement was one of benefit to the bondholders. It should also be borne in mind that these payments were not only for the benefit of the bondholders, but were for the benefit of Labowitch as well as the owners of the property. Payment of cost of repairs to the building and premiums of insurance on the building were alike for the benefit of all the parties concerned. If the consideration for the agreement between the bondholders and Labowitch was the withholding of the foreclosure proceedings by the bondholders' committee, the fact is that in April of 1932, a bill to foreclose was, in fact, filed by the trustee at the instigation of the bondholders' committee. This consideration for the alleged trust, if it was in fact a consideration for the agreement, was broken by cross complainants.

A written trust agreement could easily have been procured if it were the intention of the parties to

create a trust. Instead of this, however, there appears to have been some discussion of the proposition of requiring a countersigning by the trustee or some other person designated upon all checks drawn against the account. If such an agreement had been perfected it would not have been evidence of trust and confidence reposed in Labowitch and would have failed to indicate a trust. On the other hand if such condition had been agreed to and carried out, the present situation would not have arisen. At least there could have been no possibility of the assignment by Labowitch of his interest in the fund to the assignees of that fund who are made parties to this suit. The evidence in support of the position of the bondholders' committee appears to be based upon the testimony of Zimmermann and Rosenberg, a former lawyer for Labowitch.

Zimmermann testified that he had a conversation with Rosenberg and Morris in which they stated that the money collected would be used for the benefit of the leasehold bondholders and that no money would be paid out of the fund except for the operation of the property, without first taking it up with him.

Zimmermann was a trust officer of the Chicago Title and Trust Company. His interest in the proposition is not disclosed other than that this company appears to have been the depositary of the bonds issued under the trust agreement.

Rosenberg testified that he was attempting to prevent a foreclosure and was seeking to satisfy the bondholders' committee on behalf of Labowitch. He stated that he told Zimmermann that the funds were to be used for operating expenses and that no extraordinary expenses would be made without his knowledge; that the word "trust" with reference to the fund was not used.

Anderson, a witness called on behalf of the cross complainants, testified that he was secretary of the

Greenebaum Bondholders Protective Committee and that Labowitch was present at a meeting of Zimmermann and himself and that Labowitch suggested that a special account be set up where the moneys would be deposited and that the operations would be paid out of this account and the balance held in lieu of a receivership for the benefit of the bondholders. Labowitch, himself, denied that he made any such statement and did not agree to set up a separate account to be used for the benefit of bondholders.

It is apparent from the testimony and the actions of the parties that there was no definite understanding as to the creation of a trust fund. The creation of the fund appears to have been part of a series of negotiations between Labowitch, the bondholders' committee, and the owner of the property. It appears to have been a makeshift arrangement between parties antagonistic to each other, as a temporary expedient and, so far as the relationship between the parties is concerned, fails to indicate any reposing of trust or confidence by any of the parties in any of the other parties concerned in the arrangement. A trust should be based upon a particular fund or article of property. The existing agreement at most appears to have been with reference to future rentals which were to be paid out to the best advantage to all parties concerned. There is considerable confusion as to the dates of the conversations with reference to the time that the original special account was made with the Central Republic Bank and Trust Company. This was the account which was afterwards transferred to the First National Bank. Some of the testimony offered by cross complainants would indicate that the arrangement was made after the special deposit had been created. In our opinion the testimony was not of such a character as to comply with the rule that in order to create a trust it should be established by evidence un-

equivocal and unmistakable. The burden was upon the cross complainants to establish such a trust and in our opinion the master properly found that the burden had not been sustained. The chancellor in dismissing the cross-bill did so on the ground that the agreement was inequitable and unconscionable.

This court is not concerned with the reason for dismissing the cross-bill if as a matter of fact it should have been dismissed, and the decree of the chancellor should, therefore, be affirmed. This court, therefore, finds under the law and facts in this case that both the bill of complaint and the cross-bill of the bondholders' committee should be dismissed and the title to the fund found to be in Labowitch, subject to the rights of the First National Bank and the assignees of that part of the fund recognized by Labowitch, by his assignment or by his checks issued against it.

The costs of the proceeding should be reassessed; two-thirds against the complainant and one-third against the cross complainants, the bondholders' committee.

This cause was consolidated and considered with Gen. No. 37,797 in this court.

For the reasons stated in this opinion, the decree of the superior court is reversed in part and affirmed in part and remanded with directions to proceed in accordance with the views expressed in this opinion.

*Judgment reversed in part and affirmed in part and cause remanded with directions.*

HEBEL, P. J., and HALL, J., concur.